**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **PATRICIA BENTON LEE,** | |
| Appellant, | Civil Action No. 7:20-CV-222 (HL) |
| v. | Appeal from the United States Bankruptcy Court for the Middle District of Georgia, Case No. 19-71337-JTL |
| **U.S. NATIONAL BANK ASSOCIATION, not in its individual capacity but solely as TRUSTEE FOR RMAC TRUST, SERIES 2016-CTT,** | |
| Appellee. | |

**ORDER**

Before the Court is Appellant Patricia Benton Lee's appeal from the United States Bankruptcy Court's October 23, 2020 Order granting Appellee U.S. National Bank Association's motion for relief from the stay filed August 18, 2020. The Bankruptcy Court granted Appellee relief from the stay upon concluding that Appellant's mortgage is subject to the anti-modification provision of 11 U.S.C. § 1123(b)(5). After considering both parties' briefs and reviewing the relevant law, this Court **AFFIRMS** the decision of the Bankruptcy Court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Appellant Patricia Benton Lee resides at 105 Albert Lane in Ochlocknee, Georgia. (Hearing Tr., p. 23). She inherited the property from her father. (Id.). A small brick house sits on forty-three acres of land. (Id. at p. 23-24). Approximately

two-and-a-half acres is used in connection with the residence. (Id. at p. 25). Appellant leases around thirty-five acres as farmland at $90 an acre pursuant to a written lease agreement. (Id. at p. 24, 30). That portion of the property has always been farmed either by Appellant's family or by a lessee. (Id. at p. 24-25).

In September 2007, Appellant mortgaged the property through Quicken Loans, Inc. for $140,000. (Id. at p. 15-16, 25). Appellant obtained the loan to consolidate debt she acquired following her divorce. (Id. at 25-26). The mortgage subsequently sold several times, purportedly without notice to Appellant. (Id. at p. 16, 29). In March 2010, an agent for the mortgage company holding the mortgage contacted Appellant to inform her that she was eligible for the Housing Action Resource Test ("HART") federal refinancing program enacted as part of the 2008 economic recovery package. (Id. at p. 16, 26-27). The agent explained that in order to qualify for the program, she had to be at least ninety days in default. (Id. at p. 27). Accordingly, she was instructed to stop making mortgage payments. (Id.). The agent assured Appellant that once the process was finalized, she would have smaller payments at a lower interest rate. (Id.).

Appellant stopped making payments and defaulted on her mortgage. (Id.). She received her first acceleration and foreclosure notice in July 2010. (Id.). Appellant attempted to communicate with the mortgage company, sending them the requested paperwork numerous times. (Id.). Despite best efforts to comply with

the loan modification application requirements, Appellant was unable to secure a loan modification. (Id. at p. 17, 27-28).

Appellant filed a petition for Chapter 11 bankruptcy on November 1, 2019. Appellee U.S. National Bank Association, not in its individual capacity but solely as Trustee for RMAC Trust, Series 2016-CTT, filed a proof of claim for $253,070.25, representing $139,195.75 in unpaid principal and interest of $82,228.15. Appellee filed a motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) on August 18, 2020. On September 14, 2020, Appellant submitted a plan for confirmation, which included a proposal to modify the mortgage on her property. By order dated October 23, 2020, the United States Bankruptcy Court for the Middle District of Georgia granted Appellee's motion for relief from the automatic stay, finding that the provisions of 11 U.S.C. § 1123(b)(5) prohibit modification of the mortgage. Appellant appeals that decision.

## II.    STANDARD OF REVIEW

A district court functions as an appellate court when reviewing bankruptcy judgments on appeal. Williams v. EMC Mortg. Corp. (In re Williams), 216 F.3d 1295, 1296 (11th Cir. 2000). The district court reviews the bankruptcy court's legal conclusions *de novo*, and it reviews the bankruptcy court's findings of fact for clear error. Fla. Agency for Health Care Admin. v. Bayou Shores SNF, LLC (In re Bayou Shores SNF, LLC), 828 F.3d 1297, 1304 (11th Cir. 2016). Here, the parties do not

challenge the Bankruptcy Court's findings of fact. Appellant disputes only the Bankruptcy Court's legal conclusions.

## III.   DISCUSSION

The bankruptcy court cannot confirm a Chapter 11 plan unless the plan satisfies the requirements of the Bankruptcy Code. <u>See</u> 11 U.S.C. § 1129(a)(1). One such provision is the anti-modification provision found at 11 U.S.C. § 1123(b)(5). Under § 1123(b)(5), any loan secured by real property used by the debtor as a principal residence is excluded from modification:

> A plan may modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. 1123(b)(5). Appellee argues that its claim is secured only by a security interest in the subject property, which is both real property and Appellant's principal residence. Accordingly, Appellee asserts that its rights may not be modified by Appellant's Chapter 11 plan. Appellant, however, avers that because the property is both her principal residence and income producing property, § 1123(b)(5)'s modification exclusion does not apply.

Courts have not reached a consensus on how to apply § 1123(b)(5) where the real property is both the debtor's principal residence and income producing property. <u>See</u> <u>In re Cady</u>, No. 3:14-bk-3817-PMG, 2015 WL 631359, at *2 (Bankr. M.D. Fla. Jan. 27, 2015) ("Courts have struggled with the application of

4

§ 1123(b)(5) in cases where Chapter 11 debtors assert that their property has multiple uses."). The Eleventh Circuit Court of Appeals has not addressed the issue. As the Bankruptcy Court explained in this case, courts have adopted three different approaches: (1) the traditional statutory interpretation approach, In re Wages, 479 B.R. 575, 583 (Bankr. D. Idaho 2012), aff'd, 508 B.R. 161 (9th Cir. BAP 2014); (2) the terms of the mortgage approach, In re Scarborough, 461 F.3d 406, 408 (3d Cir. 2006); (3) the case-by-case approach, In re Brunson, 201 B.R. 351, 353 (Bankr. W.D.N.Y. 1996). Here, the Bankruptcy Court was persuaded that the Wages approach is proper. However, the Bankruptcy Court concluded that Appellant's argument is meritless under any of the three approaches. Appellant claims that decision was erroneous and urges the Court to reverse the decision of the Bankruptcy Court.

### A.   **Wages Approach**

The Wages approach looks to the plain language of the statute to determine whether the use of the property for any purpose other than as the debtor's principal residence exempts the property from the anti-modification provision. The "'cardinal cannon' of statutory interpretation is that 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" United States v. Aldrich, 566 F.3d 976, 978 (11th Cir. 2009) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)). Thus, the starting point of statutory interpretation is always "the language of the statute itself." Randall v. Loftgaarden,

478 U.S. 647, 656 (1986). Where the statute's language is unambiguous, the court's inquiry ends. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).

The language of § 1123(b)(5) is unambiguous. The statute provides that through a Chapter 11 bankruptcy plan, a debtor may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1123(b)(5). The Wages court breaks the requirements of the statute into three parts: first, the court must "determine whether a claim is secured only by a parcel of real property; if it is, the court must then determine if that property is the debtor's principal residence; and, if it is, the debtor may not modify the claim secured by that property." In re Wages, 479 B.R. at 579. The parties here do not dispute that the first two elements have been met. As in Wages, where the debtor used the subject property for both residential and agricultural purposes, the focus here is on whether the real property used to secure the debt is Appellant's principal residence. Id. at 577. Appellant argues that because she leases a portion of the property as farmland, the property used to secure the debt thus is not used exclusively as her principal residence, and the anti-modification provision does not apply.

Breaking down the language of the statute, the phrase "secured only by a security interest in real property that is the debtor's principal residence" modifies the word "claim" and explains which type of claim cannot be modified. See id. at

6

579. "The word 'only' modifies the word 'secured' and clarifies that a claim cannot be modified if it is secured by 'a security interest in real property that is the debtor's principal residence' and not secured by anything else." In re Hock, 571 B.R. 891, 895 (Barkr. S.D. Fla. 2017). The word "only" modifies no other word. Id. (citing In re Macaluso, 254 B.R. 799, 800 (Bankr. W.D.N.Y. 2000) (analyzing the analogous Chapter 13 anti-modification provision and indicating that "the statute does not limit its application to property that is used only as a principal residence[ ] but refers generally to any parcel of real property that the debtor uses for that purpose") (emphasis in original). Under this plain reading of the statute, the fact that Appellant utilizes some portion of the property for a purpose other than as her principal residence is irrelevant. "Simply put, either a property is a debtor's principal residence or it is not; the existence of other uses on the property does not change that." In re Wages, 479 B.R. at 581 (citing In re Macaluso, 254 B.R. at 800) ("So long as the only collateral is a single parcel of real estate, it matters not that that parcel may fulfill many uses or be divided into many units. The statutory requirements are fulfilled whenever the debtor principally resides in that real estate or some part thereof.").

In order to reach the result advocated by Appellant, the Court would have to read "only" or "exclusively" into the statute a second time to describe "the debtor's principal residence." The statute then would read: a Chapter 11 debtor may "modify the rights of the holders of secured claims, other than a claim secured only by a

security interest in read property that is <u>exclusively</u> the debtor's principal residence." "If Congress had meant to apply the anti-modification provision to claims secured only by property used <u>only</u> or <u>exclusively</u> as the debtor's principal residence, Congress could easily have" included language to that effect. <u>In re Hock</u>, 571 B.R. at 895.

Furthermore, the Bankruptcy Code defines "debtor's principal residence" as "a residential structure if used as the principal residence by the debtor, including incidental property, without regard to whether that structure is attached to real property." 11 U.S.C. § 101(13)(A). The Code defines "incidental property" as "property commonly conveyed with a principal residence in the area where the real property is located." 11 U.S.C. § 101(27)(B)(A). A debtor's "principal place of residence" therefore includes both the residential structure and any incidental property. There is no language in the Code suggesting that the structure and the incidental property can somehow be bifurcated, nor is there evidence in this case that the residence and adjoining farmland were conveyed independently. Rather, at the hearing held before the Bankruptcy Court, Appellant's son testified that the forty-three acres and the home were transferred to Appellant together as one property. (Tr. at p. 23).

Appellant relies on <u>Lomas Mortg. v. Louis</u>, a First Circuit decision addressing an identical version of the anti-modification provision in Chapter 13 cases. 82 F.3d 1 (1st Cir. 1996) (holding that the anti-modification provision "did not bar

8

modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to other income-producing units"). The court in <u>Lomas</u> found the statute ambiguous and turned to legislative history. <u>Id.</u> at 4. The legislative history for the Chapter 13 provision did not resolve the issue for the First Circuit; however, the court found guidance in the legislative history for § 1123(b)(5). The Judiciary Committee Report specifies that the anti-modification provision of § 1123(b)(5)

> does not apply to a commercial property, or to any transaction in which the creditor acquired a lien on property other than real property used as the debtor's residence.

H.R.Rep. No. 835, 103d Cong., 2d Sess. 46 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 3340, 3354.

The Report references <u>In re Ramirez</u> as an example of when the anti-modification provision does not apply. 62 B.R. 668 (Bankr. S.D. Cal. 1986). In <u>Ramirez</u>, the lender held a security interest in property consisting of the debtor's principal residence along with two rental units. 62 B.R. at 668-69. The <u>Ramirez</u> court determined that the anti-modification provision does not apply where the security interest includes the rental property. <u>Id.</u> The court in <u>In re Adebanjo</u> reached the same conclusion. 165 B.R. 98 (Bankr. D. Conn. 1994). The subject property in that case was known as 183-198 Taft Avenue and consisted of three dwelling units. <u>Id.</u> at 99. The debtor resided in one of the units and rented out the other two units. <u>Id.</u> As in <u>Ramirez</u>, the <u>Adebanjo</u> court concluded that the anti-

9

modification provision does not apply to "real property which is designed to serve as the principal residence not only for the debtor's family but for other families." Id. at 104 ("Had Congress intended the protections of [the anti-modification provision] to apply to property which serves as both the debtor's residence and as income-producing rental property, it would have employed words to that effect.").

This case is distinguishable from the line of multi-unit cases relied on by Appellant. Here, there is one dwelling unit in which Appellant resides located on one piece of property, which collectively secure the debt held by Appellee. And, as Appellee states, the property is not inherently income producing. "Clearly, the anti-modification provision's practical and policy considerations as applied to multi-family dwellings are not the same as those applicable" to a third-party lease for farming. In re Wages, 479 B.R. at 582. Moreover, the holdings in Lomas, Ramirez, and Adebanjo are not necessarily in conflict with the Wages' plain language reading of the statute. In each of those cases the debt was secured not only by the debtor's principal residence but also by the rental units. The debt thus was not secured "only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1123(b)(5).

The Court concurs with the Bankruptcy Court and concludes that the language in § 1123(b)(5) is clear and unambiguous. Thus, there is no need to consult the legislative history. Here, the only security for Appellee's claim is Appellant's property, which is undisputedly her principal residence. The fact that

Appellant also leases a portion of that property for farming purposes does not change that fact. The anti-modification provision of § 1123(b)(5) therefore applies.

B.     <u>Scarborough</u> Approach

The Bankruptcy Court also examined the approach adopted by the Third Circuit in <u>In re Scarborough</u>, 461 F.3d 406 (3d Cir. 2006). The debtor in <u>Scarborough</u> purchased a two-story semi-detached residence that had been converted into a multi-unit dwelling, with one apartment on the first floor and one on the second. <u>Id.</u> at 409. The debtor testified that she purchased the property with the intent of living in one of the units and renting the other. <u>Id.</u> Her mortgage documents reflected that intent. <u>Id.</u> When she purchased the property, the debtor executed two security instruments. <u>Id.</u> First, she executed a "Pennsylvania— Single Family—FNMA/FHLMC Uniform Instrument," which contains a conveyance clause granting the lender an interest in the property along with all improvements, easements, rents, royalties, mineral, oil and gas rights and profits, water rights, and all fixtures that are a part of the property. Additionally, the debtor signed a "2- 4 Family Rider (Assignment of Rents)." <u>Id.</u> This document amended and supplemented the mortgage to provide for the assignment of all rents and revenues and, upon the lender's request, all leases of the property. <u>Id.</u>

As in <u>Wages</u>, the court in <u>Scarborough</u> found the language contained in the Chapter 13 anti-modification provision to be unambiguous. <u>Id.</u> at 413. However,

the court focused on different terminology. The <u>Scarborough</u> court emphasized the function of word "is":

> By using the word 'is' in the phrase 'real property that <u>is</u> the debtor's principal residence,' Congress equated the terms 'real property' and 'principal residence.' Put differently, this use of 'is' means that the real property that secures the mortgage must <u>be only</u> the debtor's principal residence in order for the anti-modification provision to apply.

<u>Id.</u> at 411 (emphasis in original).[1] Reading the statute in this fashion, the court concluded that a "claim secured by real property that is, even in part, <u>not</u> the debtor's principal residence does not fall under the terms" of the anti-modification provision. <u>Id.</u> (emphasis in original). "Consequently, 'real property which is designed to serve as the principal residence not only for the debtor's family but for other families is not encompassed by the clause.'" <u>Id.</u> (quoting <u>In re Adebanjo</u>, 165 B.R. at 104).

The <u>Scarborough</u> court recognized one objection to this reading of the statute is that "a debtor could easily sidestep the . . . home mortgage exception by adding a second living unit to the property on the eve of the commencement of" his bankruptcy proceedings. <u>Id.</u> at 412 (citation omitted). Accordingly, when

---

[1] The <u>Wages</u> court cautioned against a "hyperliteral interpretation . . . equating 'real property' with a 'debtor's principal residence'" as such a reading "could lead to absurd results when applied." 479 B.R. at 580. The court there explained that "[i]f the Code's anti-modification provision's protections extend solely to claims secured by the <u>structure</u> a debtor uses as his or her principal residence (i.e., the house), the provision would have no application to most residential mortgage loans, which are typically secured not only by a residential structure, but also by the real property on which the structure sits." <u>Id.</u> (emphasis in original).

determining whether a creditor has taken a security interest in property other than real property, the court must examine the terms of the mortgage at "the critical moment . . . when the creditor takes a security interest in the collateral." Id. "[I]t is at that point in time that the lender must know whether the loan it is making may be subject to modification in a [bankruptcy] proceeding at some later date." Id.

There are two noticeable differences between the case before the Court and Scarborough. First, the subject property in Scarborough was a multi-family dwelling, not a single-family home. Id. at 409. Second, the mortgage documents in Scarborough plainly evidenced that the mortgage and the Family Rider granted the creditor an interest in property in addition to the debtor's principal residence. Id. at 412. The court there explained, "When a mortgagee takes an interest in real property that includes, by its nature at the time of transaction, income-producing rental property, the mortgage is also secured by property that is not the debtor's principal residence[,] and the claim may be modified in a debtor's later [bankruptcy] proceeding." Id.

Such is not the case here. As discussed by the Bankruptcy Court, the loan documents in this case do not demonstrate that Appellee knew that it was taking an interest in property that was not Appellant's principal residence. Rather, the mortgage contains the legal description for the entirety of the property recorded as "Lot 65 of the 13th land district of Thomas County, Georgia." (Doc. 7, p. 25). The document does not sever Appellant's personal residence from the remainder of

the land she leased. Nor does the mortgage identify any portion of the property as commercial or anything other than residential property. Accordingly, as held by the Bankruptcy Court, under the <u>Scarborough</u> approach, Appellant's argument fails.

      C.    <u>Brunson</u> Approach

      The Bankruptcy Court likewise found that Appellee's claim is not subject to modification under the case-by-case approach. <u>See</u> <u>In re Brunson</u>, 201 B.R. 351, 352-53 (Bankr. W.D.N.Y. 1996) (finding the plain meaning approach inconclusive and concluding instead that the court should examine the totality of the circumstances surrounding the mortgage transaction. This approach requires the court to consider the intention of the parties, taking into consideration a variety of factors:

> whether the Debtor (to the lender's knowledge) owned other income producing properties or other properties in which she could choose to reside; whether she had a principal occupation other than as a landlord, and the extent to which rental income or other business income produced from the real estate contributed to her income; whether her total income was particularly high or particularly low; whether the mortgage was handled through the commercial loan department or the residential mortgage loan department of the lender; whether the interest rates applied to the mortgage were home loan rates or commercial loan rates; the demographics of the market . . .; and the extent to which, and purpose for which, potential business uses of the land (such as farming) were considered by the lender.

<u>Id.</u> at 353. Evaluating the totality of the factors, a court then "may conclude whether in fact the property is 'commercial' property . . . or whether it is . . . 'real property used as the debtor's residence.'" <u>Id.</u> at 354. "The [c]ourt must focus on the

predominant character of the transaction, and what the lender bargained to be within the scope of its lien." Id.

This approach has been widely criticized. The Scarborough court opined that the case-by-case approach's multi-factor test "introduces uncertainty and unpredictability to residential mortgage transactions because it requires courts to engage in subjective, hindsight analysis as to the intent of the parties." 461 F.3d at 414. The Wages court similarly described the approach as "unworkable." 479 B.R. at 582. The court there noted the importance of consistency in the lending market:

> Markets work best when there are clear rules consistently applied. Although investors certainly value fairness, they place an even higher value on certainty. Investors can adjust for inequities. It is much harder to adjust for uncertainty. Deciding whether a particular mortgage falls within the home mortgage exception perhaps years after the fact on a case-by case basis may ensure an equitable resulted for a particular debtor or lender involved. However, the home mortgage lending market as a whole pays a price for this result because of the considerable uncertainty such an approach lends to the underwriting decision when home loans are made.

Id. (quoting In re Bulson, 327 B.R. 830, 842 (Bankr. W.D. Mich. 2005)).

Nevertheless, even if the Court were to adopt this approach, Appellant's argument would still fail. The evidence presented to the Bankruptcy Court reveals that Appellant works outside her home at a local law firm for approximately thirty hours per week. (Hearing Tr. at 36). The rental income Appellant receives from leasing a portion of her property accounts for only 7.3% of her monthly income.

15

(Doc. 7-2, p. 15; Doc. 7-2, p. 30). The mortgage documents further include a 6.375% interest rate, which the Bankruptcy Court noted fell within the average residential mortgage rate for the relevant time period.[2] (Doc. 7-1, p. 7). Moreover, the debt was to be paid to the home loan department, not a commercial lender. (Id. at p. 9-10). Additionally, there is no indication from the mortgage documents that the lender was aware Appellant intended to use the property for a commercial purpose. Thus, balancing these factors, even under a case-by-case analysis, the Bankruptcy Court was correct in determining that Appellant may not modify Appellee's claim.

## IV.    CONCLUSION

Upon conducting a *de novo* review of the Bankruptcy Court's legal conclusions, the Court concurs with the findings of the Bankruptcy Court and finds that, regardless of the approach taken, Appellant's property is subject to the anti-modification exception of 11 U.S.C. § 1123(b)(5). Accordingly, the Court **AFFIRMS** the order of the Bankruptcy Court.

---

[2] In September 2007, the average residential mortgage rate was approximately 6.38%, while the average commercial mortgage rate was 6.99%. 30-Year Fixed-Rate Mortgages Since 1971, FREDDIEMAC, http://freddiemac.com/pmms/pmms.30.html; *Weighted-Average Effective Loan Rate for All Commercial and Industry Loans, All Commercial Banks (DISCONTINUED)*, FEDERAL RESERVE ECONOMIC DATA, https://fred.stlouisfed.org/series/EEANQ.

**SO ORDERED**, this 4th day of October, 2021.

_**s/ Hugh Lawson**_____
**HUGH LAWSON, SENIOR JUDGE**

aks